UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**BOOKWORLD TRADE, INC., d/b/a**
**"Bookworld Companies," a Florida corp.,**

**Plaintiff,**

**vs.**                                          **Case No.: 8:06-CV-1746-T-27MAP**

**DAUGHTERS OF ST. PAUL, INC., a**
**Massachusetts not-for-profit corporation**
**d/b/a "Pauline Books and Media,",**

**Defendant.**
_____/

## ORDER

**BEFORE THE COURT** are: (1) Defendant/Counterclaim Plaintiff Daughters of St. Paul,

Inc., d/b/a "Pauline Books and Media's" ("PBM's") Motion for Summary Judgment (Dkt. 57), to

which Plaintiff/Counterclaim Defendant Bookworld Trade Inc. ("Bookworld") and "Cross-Claim

Defendant" Ronald Ted Smith ("Smith")[1] have responded in opposition (Dkt. 64); (2) Motion for

Partial Summary Judgment by Bookworld and Smith (Dkt. 58), to which PBM has responded in

opposition (Dkt. 68); and (3) Bookworld and Smith's Objection and Motion to Strike Certain PBM

Exhibits (Dkt. 65), to which PBM has responded in opposition (Dkt. 79) after filing additional

affidavits and declarations without leave of Court (Dkts. 76-78).[2]

---

[1] PBM filed purported "counterclaims" against Ronald Smith, who is not a named Plaintiff. Although
Bookworld has repeatedly asserted that PBM's claim against Ronald Smith is properly termed a "cross-claim," the
claim is actually a third-party claim pursuant to Rule 14(a) of the Federal Rules of Civil Procedure. PBM did not
move to assert a third-party claim, did not file a third party complaint, and did not file a return of service as to Smith.
Nonetheless, Smith, who was represented by counsel through the filing of the Pretrial Statement, has not objected to
the assertion of these claims against him and has actively defended them. Accordingly, this Court considers any
objection to personal jurisdiction or the procedural posture of his joinder in this action to have been waived.

[2] These affidavits were apparent attempts to correct the deficiencies identified in Bookworld's and Smith's
Motion to Strike.

1

## *Procedural History*

At its essence, this case is a contract dispute, centering on a book distribution agreement between the book publisher, PBM, and the distributor, Bookworld. Smith is the President of Bookworld. Bookworld materially breached the agreement by not paying monthly collections when they became due. Bookworld filed a preemptive action in state court, which PBM removed to this Court on September 22, 2006 (Dkt. 1). Bookworld's Complaint alleged claims for declaratory judgment, breach of contract, and tortious interference. (Dkt. 2). PBM responded by filing a host of counterclaims against Bookworld and Smith: breach of contract (Counts I and II), conversion (Count III), unfair and deceptive trade practices under Massachusetts and Florida law (Count IV), fraud (Count V), fraudulent inducement (Count VI), civil theft (Count VII), and unjust enrichment (Count VIII). (Dkts. 19, 62). No motions to dismiss for failure to state a claim were filed by any party. The parties' summary judgment briefs are lacking in relevant legal analysis.

Bookworld's counsel was permitted to withdraw on October 1, 2007. (Dkt. 92). Bookworld has failed to retain new counsel. As a result, and as set forth by contemporaneous Order, this Court is dismissing Bookworld's claims against PBM and entering default judgment against Bookworld on PBM's counterclaims that survive the parties' motions for summary judgment.

## *Motion to Strike*

PBM submitted the majority of the exhibits to its Motion for Summary Judgment without authenticating affidavits. Bookworld moved to strike Exhibits D-O, T-V, X and AA. (Dkt. 65). PBM argues that Exhibits D, M, and N are contained in Bookworld's Complaint. Similarly, Exhibits J, K, and L are attached to Smith's Declaration in support of Bookworld's Motion for Partial Summary Judgment (Dkt. 66-2), and Exhibit G is attached to Wilfred Niquette's Declaration in

2

support of Bookworld's response to PBM's Motion for Summary Judgment (Dkt. 67). Accordingly, the Court considers Bookworld's objection to the authenticity of exhibits submitted by Bookworld to be waived. The motion to strike is therefore denied as to the foregoing exhibits.

Bookworld also objects to the submission of the "Meeting Minutes" from a May 6, 2005 meeting between Smith and PBM representatives. Meeting minutes may fall under the hearsay exception in Rule 803(6) of the Federal Rules of Civil Procedure for records of regularly conducted activities, if the document is authenticated "by the testimony of the custodian or other qualified witness." Fed. R. Evid. 803(6); *Lloyd v. Prof'l Realty Servs., Inc.*, 734 F.2d 1428, 1433 (11th Cir. 1984). Although PBM has not submitted the requisite authentication, a hearsay statement may be considered on a motion for summary judgment if the statement could be "reduced to admissible evidence at trial." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Nevertheless, PBM has made no effort to demonstrate that the meeting minutes could be reduced to admissible form at trial. PBM has not proposed a "qualified witness," and the identity of the author of the minutes is not apparent from the document. The motion to strike Exhibit H is therefore granted. *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996).

The remainder of the motion to strike is denied as moot, as the Court has not relied on the other challenged documents. In denying the motion as moot, the Court makes no finding as to the admissibility of any exhibits or as to whether Richard Yochem has been properly qualified as an expert witness.

### *Factual Background*

In November 2004, PBM and Bookworld began negotiating a book distribution contract. Sister Joan Paula Arruda ("Arruda"), PBM's former manager of the Order Department, avers that

part of the reason for PBM's decision to enter into a contract with Bookworld was Smith's promise that it would market PBM's books to 1000 religious accounts and 2000 non-religious accounts. (Dkt. 57-3, Arruda Aff. ¶ 5). In return for this promise, PBM gave Bookworld a list of 1000 of its own accounts. (Arruda 1 Aff. ¶ 6). This arrangement was not included in the parties' written agreement.

On December 10, 2004, PBM, as Publisher, signed an "agreement for book sales" with Bookworld, as Distributor ("the Agreement"). (Dkt. 57-14). Smith signed the Agreement on behalf of Bookworld on December 14, 2004. (Dkt. 57-14). The Agreement provided, in relevant part:

> **Revenues and reports**: Distributor will make available to Publisher, on or about the 10th of each month, on the Internet, an accounting of sales, returns and collections for preceding month, plus current inventories. If Publisher wishes a printed report, there is a charge. As Distributor collects from its sales, Publishers will be sent, the month following collections, on or about the 25th:
>> When months collections total under $25,000 averaged for six months, 34% of the retail price
>> For $25,001 or more, 35% of the retail price

In January 2005, PBM sent its inventory to Bookworld's warehouse in Tennessee. (Arruda Aff. ¶ 9). Bookworld received no revenues until May 6, 2005, when Arruda attended a meeting in Boston with Smith, who provided a check for $8,397.67. (Arruda Aff. ¶¶ 11-12). During the meeting, representatives from PBM and Smith reviewed customer complaints and Bookworld's failure to contact the accounts PBM had supplied. *Id.*

Plaintiff alleges that Bookworld's payments were routinely untimely. Between May and October 2005, Bookworld made the following payments:

| | | |
|---|---|---|
| May 31, 2005 | $8,001.27 | (April receivables) |
| June 24, 2005 | $20,059.50 | (May receivables) |
| July 26, 2006 | $28,788.50 | (June receivables) |
| August 25, 2005 | $28,590.16 | (July receivables) |
| October 13, 2005 | $24,073.10 | (August receivables) |

4

| October 28, 2005 | $24,073.09 | (August receivables) |
| October 31, 2005 | $27,890.78 | (September receivables) |
| December 28, 2005 | $19,745.19 | (October receivables) |

(Dkt. 57-17 at 2-8).

Bookworld's Chief Financial Officer, Wilfrid Niquette, concedes that Bookworld made late and split payments, and that the final payment on December 28, 2005, for October collections, was over one month late. (Dkt. 67, Niquette Aff. ¶¶ 9-10). No payments were made after December 28, 2005.

As a result of the late payments, PBM requested that it not be included in Bookworld's 2006 catalog. In response to an email from Randy McKenzie, a Bookworld sales employee, inquiring as to whether PBM would be included in the catalog, Arruda sent an email on November 22, 2005, stating, in relevant part:

> Our directors and Provincial Council are currently reviewing the contracts we have with Bookworld and other distributors these days. Since our discussions will carry us beyond the date on our contract with Bookworld I think it would be best if you continue with your catalog preparations as you see fit. It is not our intention to hold up your catalog so I would suggest going ahead without the inclusion of Pauline product. (Dkt. 57-19, Exh. J).

PBM sent a final shipment of inventory to Bookworld on December 6, 2005. (Arruda Aff. ¶ 21). Bookworld contends that PBM breached the Agreement by failing to provide inventory after this shipment. (Dkt. 2, Compl. ¶ 27). There is no provision in the Agreement describing PBM's duties with respect to the provision of inventory, however.

PBM contends that the November 22, 2005 email terminated the contract, or, alternatively, that the Agreement ended automatically in December 2005. (Dkt. 57 at 4). The Agreement provided the following provisions concerning its term and termination:

> **Effective date and term**: This agreement becomes effective on date shown below, unless modified by an addendum, and will continue for at least one year, after which it will continue until Publisher of Distributor gives 90 days' advance notice or intent to modify or terminate it. It may cease at the end of either sales season (June 30,

5

Dec. 31).

**Termination**: Upon termination of this agreement, Publisher will advertise the termination briefly (a classified ad of one sentence or so) -- as a defense against being sent returns indefinitely. This ad shall run in Publishers Weekly, and shall allow 90-days acceptance of returns for credit by Distributor. . . . Upon Publisher termination, Distributor will reserve all monies received as of termination date for a period of four months.

Smith responded to Arruda's November 22, 2005 email with two emails, essentially requesting that PBM remain with Bookworld.[3]  On January 9, 2006, Smith wrote again to Arruda:

I've not heard from you re your analysis of our relationship. Since we have now rolled into the new year, I am assuming we are continuing. It would be madness not to. But I would like to have confirmation of this from you, at which time we can release the payment I ordered withheld to protect us, when there were murmurings of your doing otherwise. (Dkt. 66-2, Exh. 4).

By letter dated February 22, 2006, PBM's attorney, Michael McLaughlin, informed Bookworld that it was in material default under the Agreement for holding monthly collections and not releasing PBM's inventory. (Dkt. 57-19, Exh. M).  The letter noted that PBM was running the Publishers Weekly add required by the termination clause of the Agreement. *Id*.  Bookworld contends that McLaughlin's letter started the 90 day notice period provided for in the termination clause. As a result, Bookworld claims that it had an additional four months from the termination date, June 30th, to withhold collections.

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any

---

[3] A November 22, 2005 email stated, in part: "And if you are tending in the direction my intuition says you are, then I might be able to save you from a costly mistake. Among other things, changing distributors means four to six months with no income. . . . Don't let us part without an educational discussion." (Dkt. 57-19, Exh. K).  An undated follow-up email queried: "What do you think you can get from some other distributor that you are not getting here?" (Dkt. 57-19, Exh. L).

material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### *Discussion*

### A.   *Breach of Contract*

### 1.   *Bookworld (Count I)*

The elements of a breach of contract action are: (1) a valid contract, (2) a material breach,

and (3) damages. *Merin Hunter Codman, Inc. v. Wackenhut Corrs. Corp.*, 941 So. 2d 396, 398 (Fla. 4th DCA 2006). "In addition, in order to maintain an action for breach of contract, a claimant must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006). The parties do not dispute the validity of the Agreement. PBM alleges that Bookworld breached the Agreement by not timely paying collections. Bookworld alleges that PBM breached the agreement by not providing inventory after December 2005.

It is undisputed that Bookworld did not make payments "on or about the 25th" of each month, as specified in the Agreement. For instance, the payment for the August collections was made in two installments on October 13, 2005 and October 28, 2005, approximately two weeks late and one month late, respectively.[4] The payment for October collections was made on December 28, 2005, approximately one month late.

Under Florida law, however, "failure to make a payment on time does not constitute *per se* a material breach of contract. Rather, to constitute a material breach, the late payment must occur where time is of the essence." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (citing *Sublime, Inc. v. Boardman's Inc.,* 849 So.2d 470, 471 (Fla. 4th DCA 2003)).[5] Time is considered to be of the essence when: (1) the agreement explicitly so specifies; (2) it may be determined from the subject matter of the contract; (3) treating time as non-essential would

---

[4] Although PBM has argued that Bookworld breached "as early as April 2005" (Dkt. 57 at 23), by not making any payment for the first four months of the Agreement, PBM has failed to point to evidence contradicting Bookworld's assertion that it paid when the collections first generated net funds. (Niquette Dec. ¶¶ 4-6). Although this payment was made late, on May 8, 2007, rather than on or about April 25, 2007, for the reasons discussed below, this did not constitute a material breach.

[5] Because the distribution agreement is predominately a contract for services, rather than goods, Florida's Uniform Commercial Code does not apply. *Mallin v. Univ. of Miami*, 354 So. 2d 1227, 1229 (Fla. 3d DCA 1978).

produce a hardship; or (4) notice has been given to the defaulting party requesting performance within a reasonable time. *Id.*

The Agreement did not state that time was of the essence, and PBM has not alleged that any of the additional bases exists for finding that time was of the essence. PBM cites no record evidence indicating that there was hardship to PBM, that PBM gave notice to Bookworld requesting that payments be made on time, or that PBM refused to accept the late payments. Moreover, the subject matter of the Agreement does not suggest that time would be of the essence. Accordingly, Bookworld did not materially breach the Agreement by making late payments, especially since PBM accepted the same. *See Acosta v. Dist. Bd. of Trustees of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 229 (Fla. 3d DCA 2005) ("Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.").

On December 25, 2005, Bookworld's payment for November collections became due, and it is undisputed that Bookworld never made this payment. (Dkt. 57-29, Exh. W. at 4). Bookworld therefore materially breached the Agreement on or around December 25, 2005. *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1178 (11th Cir. 1994).

Bookworld argues that PBM breached the Agreement by not providing inventory after its final December 6, 2005 shipment. Bookworld fails to cite any provision in the Agreement requiring that inventory be produced, or specifying the time in which it was to be produced. Bookworld has alleged no other agreement on this term. Bookworld has not argued impossibility of performance, and the parties have cited to no evidence indicating that performance became impossible, at least not

before Bookworld breached by failing to pay.[6]  Moreover, following Bookworld's breach, PBM was

excused as a matter of law from complying with its duties under the Agreement. *Popular Bank of

Fla. v. R.C. Asesores Financieros, C.A.*, 797 So. 2d 614, 622 (Fla. 3d DCA 2001).

Bookworld suggests, although not specifically, that Arruda's November 22, 2005 email

instructing Bookworld not to include it in its 2006 catalog was an anticipatory breach of the

Agreement.  Arruda averred: "In the publishing distribution industry, this is a clear indication that

PBM was not continuing with Bookworld."  (Arruda Aff. ¶ 17).  An anticipatory breach "occurs

before the time has come when there is a present duty to perform as the result of words or acts

evincing an intention to refuse performance in the future." *Alvarez v. Rendon*, 953 So. 2d 702, 709

(Fla. 5th DCA 2007).  Under the circumstances, Arruda's November 22, 2005 email may have

evinced an intention to refuse to perform, constituting an anticipatory breach.[7]  This issue does not

control the analysis, however, because Bookworld admits that it included PBM titles in its 2006

catalog and continued to demand and sell PBM inventory through July 2006.  (Dkt. 57-29, Exh. W.

at 5).  Thus, Bookworld waived any anticipatory breach by PBM.  *See e.g., Muniz v. Crystal Lake

Project, LLC*, 947 So. 2d 464, 470 (Fla. 3d DCA 2006) (breach was waived where seller took

affirmative steps to fulfill the contract following purchaser's alleged breach); *See Acosta*, 905 So.

---

[6] The Court notes that on February 16, 2006, Smith sent an email to PBM, which stated, in relevant part:
Do you understand that by not shipping inventory to us, you are destroying our selling momentum?
-- the momentum that gets your books widely in front of your intended audience?
We currently have more than $25,000 in orders we can't fill because you have shipped no
inventory since December.
(Dkt. 66-2, Exh. 9).
This email does not suggest impossibility existed as of the date Bookworld materially breached the Agreement.

[7] The termination of the relationship at this juncture would have been in breach of the contractual provision
requiring 90 days notice of termination of the relationship, and providing that the contract could terminate only at the
end of a sales season, either December 31st or June 30th.  Based on the plain, unambiguous language of the contract,
the Agreement did not terminate automatically after one year, on December 10, 2005, as Bookworld asserts.  Rather,
the Agreement specifies that it will continue for *at least* one year, and thereafter would *continue until terminated*
with 90 days' notice.

10

2d at 229 (failure to terminate contract may result in waiver).

Based on the foregoing, the Court finds that Bookworld materially breached the Agreement in late December, by failing to provide payment for the November 2005 collections or any collections made therafter. PBM's motion for summary judgment is therefore granted on this portion of its breach of contract claim against Bookworld, and Bookworld's motion is denied.

b.      *Breach of the duty of good faith and fair dealing*

PBM also contends that Bookworld breached the implied duty of good faith and fair dealing. In order to assert a claim for breach of a duty of good faith and fair dealing, a plaintiff must allege that a specific contractual provision has been breached, causing it damages. *Centurion Air Cargo, Inc.*, 420 F.3d at 1151; *Ament v. One Las Olas, Ltd.,* 898 So.2d 147, 149 (Fla. 4th DCA 2005).[8] Moreover, the failure to perform must not be "by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Miami, Inc. v. Heidrick & Struggles, Inc.*, 329 F. Supp. 2d 1309, 1312 (S.D. Fla. 2004) (quoting *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000)).

As discussed above, Bookworld breached the Agreement by not paying PBM for any collections after October collections were paid one month late, on December 28, 2005. There is evidence suggesting that Bookworld consciously and deliberately failed to pay PBM, knowing that money was due. An undated email from Smith states "[Niquette], at end of this month please hold any payments you would have made to them. If they're truly leaving us, we need to start

---

[8] Although PBM acknowledges this principle, it also discusses the breach of Smith's promises to contact a certain number of accounts and to provide certain levels of customer service, terms that are not included in the Agreement. PBM has not argued that there was any modification of the Agreement to include these terms. Accordingly, the Court does not evaluate these allegations as independent breaches of the duty of good faith and fair dealing.

withholding." (Dkt. 57-17, Exh. G. at 10).  However, the January 9, 2006 email from Smith to

Arruda stated in part: "*I am assuming we are continuing.*"  In addition, Bookworld continued to sell

and collect on PBM titles, as demonstrated by an April 11, 2006 email from Niquette to Smith:

> As of the end of March, we owe the nuns $113,219.68.
> *We have not officially discontinued them yet.*  After we discontinue them we will
> have 7 months, by contract, to withhold monies for the possibility of returns.
> *I say we wait till we absolutely have to pay them* and then put them on a payment
> schedule, say, $10,000 per month. . . .
> I suggest that we keep selling as long as we can still ship product or get a notice from
> our attorneys to discontinue.

Bookworld has provided no explanation for its failure to remit collections, given that it was treating

the Agreement as continuing.  Moreover, it appears from these communications that, at the very

least, there is an issue of fact as to whether the withholding of money was conscious and deliberate.

The parties' motions for summary judgment are therefore denied on this portion of PBM's breach

of contract claim against Bookworld.  *See e.g.*, *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1098

(Fla. 1st DCA 1999).

## 2.  *Smith (Count II)*

In Count II, PBM brings a separate breach of contract action against Smith, individually.

Although Smith signed the Agreement for Bookworld as "President," he is not individually liable

on the Agreement, absent a piercing of Bookworld's corporate veil.  *Hester v. Tucker*, 465 So. 2d

1261, 1262 (Fla. 2d DCA 1985).  In order to render Smith individually liable on the Agreement,

three factors must be proven by a preponderance of the evidence: (1) Smith dominated and controlled

Bookworld to such an extent that Bookworld's independent existence was in fact non-existent; (2)

Bookworld was used fraudulently or for an improper purpose; and (3) the fraudulent or improper use

of Bookworld caused injury to PBM.  *Priskie v. Missry*, 958 So. 2d 613, 614-15 (Fla. 4th DCA

2007); *Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So. 2d 1114, 1120-21 (Fla. 1984).

At best, PBM can show that there are various Bookworld corporate entities, that Smith considered himself CEO of each of them, and that he and his wife were the entities' joint shareholders.[9] (Smith Dep. at 22). "The mere fact that one or two individuals own and control the stock structure of a corporation does not lead inevitably to the conclusion that the corporate entity is a fraud or that it is necessarily the alter ego of its stockholders . . . ." *Advertects, Inc. v. Sawyer Indus., Inc.,* 84 So. 2d 21, 23-24 (Fla. 1955); *see also Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1319-20 (11th Cir. 1998) (evidence that parent company provided wholly-owned subsidiary with funding was not wrongful); *Ally v. Naim,* 581 So. 2d 961, 963 (Fla. 3d DCA 1991) (fact that corporation compensates sole shareholder does not, by itself, allow piercing of the corporate veil). In addition, the testimony that the Bookworld entities shared payroll, employees, offices, and benefit plans, and other factors pertaining to corporate infrastructure of the Bookworld entities is not relevant to the question of whether *Smith* was an alter ego of Bookworld.

A showing of improper conduct, which is required to pierce the corporate veil, "is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Johnson Enters. of Jacksonville, Inc.,* 162 F.3d at 1320 (internal quotations omitted). PBM fails to cite any specific evidence indicating that Bookworld was organized or used to

---

[9] The cited evidence does not, as PBM contends, demonstrate that "all proceeds of the companies went 'into a big pot.'" Rather, the deposition testimony states that the revenues from the sale of PBM's inventory went "into a big pot," owned by Bookworld. (Smith Dep. at 173-74).

    The cited evidence also does not, as PBM contends, show that monies due PBM were used to reduce Bookworld's line of credit. Rather, Niquette testified that "if there's excess monies, the monies flow in to the line of credit" and that the accounts receivables, including PBM's account, secured the line of credit. (Niquette Dep. at 28-29). Niquette testified that Bookworld did not use PBM collections to pay operating expenses. (Niquette Dep. at 28).

perpetrate fraud or an improper purpose, such as defrauding creditors, evading obligations, circumventing a statute, achieving or perpetuating a monopoly, or furthering criminal enterprises. *Barnes v. Liebig*, 146 Fla. 219, 238, 1 So. 2d 247, 254 (Fla. 1941). PBM conclusorily argues that there are "undisputed facts that Smith dominated the Bookworld entities, used them to commit fraud, violate Bookworld's legal duties to PBM under the Agreement, and act dishonestly." (Dkt. 57 at 7). By contrast, Bookworld alleges that Bookworld has been in continuous operation as a book distribution business for eighteen years, and at the time it dealt with PBM, had approximately 100 other publishers as customers. (Dkt. 59, Smith Dec. ¶ 2).

PBM's unsupported allegations are not sufficient to warrant judgment as a matter of law. There is no evidence that Smith used Bookworld to defraud existing personal or corporate creditors, by transferring funds into or out of the corporation. *Cf. Estudios, Proyectos e Inversiones de Centro America, S.A. (EPICA) v. Swiss Bank Corp. (Overseas) S.A.*, 507 So. 2d 1119, 1120 (Fla. 3d DCA 1987) (shareholder transferred personal funds to corporation to avoid creditors); *Mason v. E. Speer & Associates, Inc.*, 846 So. 2d 529, 534 (Fla. 4th DCA 2003) (although sole shareholder converted corporate property to his own use on multiple occasions, there was no showing that this was in response to liability incurred by the corporation). Rather, PBM alleges that Bookworld wrongfully and intentionally failed to pay it and return inventory pursuant to the terms of the Agreement. Although these allegations support a viable breach of contract claim against Bookworld, PBM has not demonstrated, by a preponderance of the evidence, that Bookworld was formed or operated for an improper purpose. *U-Can-II, Inc. v. Setzer*, 870 So. 2d 99, 99 (Fla. 1st DCA 2003). Bookworld's motion for summary judgment is therefore granted on PBM's counterclaim for breach of contract against Smith individually (Count II), and PBM's motion is denied.

### B.   Conversion (Count III) and Civil Theft (Count VII)

In Counts III and VII, PBM alleges that Bookworld and Smith, individually, are liable for the conversion and civil theft of funds owed it under the Agreement, as well as the PBM inventory that Bookworld continued to hold and sell in the first half of 2006.

To maintain a cause of action under the civil theft statute, PBM must demonstrate that Smith and Bookworld violated of one or more of the provisions of the criminal theft laws found in Fla. Stat. §§ 812.012 *et seq. Balcor Prop. Mgmt., Inc. v. Ahronovitz*, 634 So. 2d 277, 279 (Fla. 4th DCA 1994). A civil theft occurs when a person "knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently: (a) Deprive the other person of a right to the property or a benefit from the property. (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property." Fla. Stat. § 812.014(1).[10]  Similarly, a conversion is an "act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." *Thomas v. Hertz Corp.*, 890 So. 2d 448, 449 (Fla. 3d DCA 2004).

As an initial matter, PBM cites no record evidence demonstrating that Smith, *individually*, "obtained" or "committed an act of dominion" over PBM's money or inventory.[11] Because PBM has failed to provide any evidence indicating that Smith, individually, possessed PBM's money or inventory in a manner sufficient to demonstrate conversion or civil theft, Bookworld's and Smith's

---

[10] Bookworld argues that PBM failed to comply with the demand requirements under Fla. Stat. § 772.17. However, unless the five year statute of limitations has expired, which it has not, summary judgment is not appropriate on that basis. *Seymour v. Adams*, 638 So. 2d 1044, 1049 (Fla. 5th DCA 1994). The Court makes no finding as to whether PBM has complied with the statutory demand requirement.

[11] PBM has made passing references in subsequent proceedings concerning Smith's use of Bookworld funds. Because these allegations are not contained in the motions for summary judgment or supported by record evidence, they do not support PBM's motion for summary judgment.

motion for summary judgment is granted Count III and Count VII against Smith.

Bookworld has generally alleged that Florida's economic loss rule bars PBM's tort and statutory claims against Bookworld. Although this argument was only cursorily included in Bookworld's opposition brief,[12] the Court will evaluate it as it relates to each of PBM's tort and statutory counterclaims. Pursuant to the economic loss rule, "a tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract" and the damages are solely economic. *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 537 (Fla. 2004); *see also Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 399 F.3d 1275, 1276 (11th Cir. 2005). Accordingly, an obligation to pay money, based on a breach of contract, may generally not be enforced by a conversion or civil theft action. *Fla. Desk, Inc. v. Mitchell Int'l, Inc.*, 817 So. 2d 1059, 1060-61 (Fla. 5th DCA 2002); *see e.g.*, *Rosy Blue, NV v. Davis*, No. 6:07-cv-465, 2007 WL 1247154, at *4 (M.D. Fla. April 30, 2007). There is a limited exception to this principle when the "defendant's acts were 'not merely a failure to perform, but an affirmative and intentional act of converting the funds to his own use by allegedly stealing the monies to which he was entrusted.'" *Pershing Indus., Inc. v. Estate of Sanz*, 740 So. 2d 1246, 1248 (Fla. 3d DCA 1999) (quoting *Burke v. Napieracz,* 674 So.2d 756, 758 (Fla. 1st DCA 1996)). In such a case, an action for civil theft or conversion may lie. *See e.g.*, *Alex Hofrichter, P.A. v. Zuckerman & Venditti, P.A.*, 710 So. 2d 127, 129 (Fla. 3d DCA 1998) (former law partner was alleged to have embezzled partnership funds); *Burke,* 674 So.2d at 758 (defendant took funds for personal use that he was contractually obligated to keep separate and use for a specified purpose).

---

[12] Specifically, in a footnote, Bookworld stated: "Bookworld recognizes that the [economic loss] doctrine may apply to bar PBM's tort claims in this case (although its undersigned counsel has philosophical concerns about application of the doctrine in cases generally)." (Dkt. 64 at 12-13 n. 6).

16

This is not such a case. PBM cites record evidence that the money from PBM's collections was deposited "into a big pot." (Smith Dep. at 173-74). However, absent a contrary provision in the agreement specifying how funds must be held, it is not conversion or civil theft to place customer funds into a general operating account. *Fla. Desk, Inc.*, 817 So. 2d at 1061. Moreover, PBM has failed to argue or demonstrate that the funds it seeks are specifically traceable to PBM. *Mazza v. Rose Media Group, Inc.*, 937 So. 2d 307, 310 (Fla. 4th DCA 2006). Based on the foregoing, Bookworld's failure to pay money owing under the Agreement is simply not grounds for a civil theft or conversion action. *Id.*; *see also Sarkis v. Pafford Oil Co., Inc.*, 697 So.2d 524, 527-28 (Fla. 1st DCA 1997).

Bookworld has also alleged conversion and civil theft of PBM's inventory. A conversion of property occurs when "a person with a right to possess property demands its return and the demand is not or cannot be met." *Day v. Amini*, 550 So. 2d 169, 171 (Fla. 2d DCA 1989). The tort of conversion does not require a showing of specific wrongful intent. *City of Cars, Inc. v. Simms,* 526 So. 2d 119 (Fla. 5th DCA 1988). By letter dated February 22, 2006, PBM's counsel advised Bookworld that it was in material default of the Agreement and demanded return of PBM's inventory within 14 days. Because Bookworld failed to return the inventory after PBM's rightful demand, the Court finds that PBM is entitled to judgment as a matter of law as to its claims for conversion of inventory against Bookworld. *Marine Transp. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1140 (11th Cir. 1994) (finding conversion where party failed to release cargo after making a demand and tendering requested payment). By contrast, Plaintiff has cited to no record evidence indicating that Bookworld possessed a "felonious intent to steal," which is required to sustain a civil theft claim. *Lewis v. Heartsong, Inc.*, 559 So. 2d 453, 454

(Fla. 1st DCA 1990).

Based on the foregoing, Bookworld's and Smith's motion for summary judgment is granted on PBM's claims for civil theft (Count VII) against both Bookworld and Smith and on PBM's claim for conversion (Count III) against Smith only. The motion is also granted to the extent PBM claims conversion of money against Bookworld, but is denied to the extent PBM claims conversion of inventory against Bookworld.

### C.   FDUTPA (Count IV)

In Count IV, PBM alleges that Bookworld and Smith violated both Florida's Unfair and Deceptive Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq*., and Massachusetts' similar law regulating unfair and deceptive trade practices, Mass. Gen. Laws 93A, §§ 1, *et seq*. (Dkt. 62, ¶¶ 61-64). PBM has not briefed the application of the Massachusetts law, and the Court considers this claim waived for the purposes of summary judgment.[13]

A claim pursuant to FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc.,* 951 So. 2d at 869.[14] A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rollins, Inc.*, 951 So. 2d at 869 (internal citation and quotations omitted). "A deceptive or unfair trade

---

[13] PBM has provided no conflicts of law analysis as to its tandem statutory claims. Instead, it offered to "defer" to this Court's "learned experience and analysis" on the "messy" issue regarding which state's law applies. (Dkt. 68 at 9 n. 16). The Court declines PBM's offer. PBM pled both claims, which, pursuant to Rule 11 of the Federal Rules of Civil Procedure, would suggest that it had a good faith basis for doing so. To the extent PBM elects to proceed on both claims, it will be required to provide pertinent authority supporting simultaneous recovery under both statutes. Failing that, PBM will be required to make an election as to the statute under which it will proceed.

[14] The economic loss rule does not bar a FDUTPA claim because it is a statutory cause of action. *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001).

practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *See State, Office of Att'y Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla.1st DCA 2004). Smith may be held individually liable pursuant to FDUTPA to the extent he "participated directly in the deceptive practices or acts or . . . possessed the authority to control them." *Id.*

Bookworld argues, relying on abrogated precedent, that FDUTPA is limited to consumer transactions, not commercial transactions. "Consumer" is broadly defined by FDUTPA to include associations, corporations, and "any other group or combination." Fla. Stat. § 501.203(7). FDUTPA therefore applies "to any act or practice occurring 'in the conduct of *any trade or commerce*' even as between purely commercial interests." *Beacon Prop. Mgmt., Inc. v. PNR, Inc.,* 890 So. 2d 274, 278 (Fla. 4th DCA 2004) (emphasis in original). Moreover, the Florida courts have held that business entities may sue for damages pursuant to Fla. Stat. 501.211(2). *True Title, Inc. v. Blanchard*, No. 6:06-cv-1871, 2007 WL 430659, at *4 (M.D. Fla. Feb. 5, 2007) (citing *Beacon Prop. Mgmt., Inc.,* 890 So. 2d 274 at 278) (noting that the 2001 amendments to the damages provision in FDUTPA deleted the reference to "consumer transactions").

Nevertheless, PBM fails to cite any legal authority supporting a finding that Bookworld's actions constituted an unfair or deceptive trade practice. Although a FDUTPA claim may arise from a single contract, this principle "does not operate to convert every breach of contract or breach of lease case into a claim under the Act. Indeed, such a construction would be precluded by the FDUTPA, which only reaches conduct that is unfair or deceptive as judged by controlling case law." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 n.2 (Fla. 2003). PBM has provided no

precedent supporting its argument that failure to pay pursuant to the terms of a contract, by itself, constitutes an unfair and deceptive trade practice. However, as set forth above, Bookworld also withheld PBM's inventory and continued to sell it, after PBM made a rightful demand for its return. Accordingly, the Court finds that there is an issue of fact as to whether the retention and sale of Bookworld's inventory after February 22, 2006 constituted an unfair and deceptive trade practice. *Suris v. Gilmore Liquidating, Inc.*, 651 So. 2d 1282, 1283 (Fla. 3d DCA 1995); *Day v. Le-Jo Enters., Inc.*, 521 So. 2d 175, 178 (Fla. 3d DCA 1988). The parties' motions for summary judgment are therefore denied on PBM's counterclaim against Bookworld and Smith for unfair and deceptive trade practices (Count IV).

### D. Fraud and Fraud in the Inducement (Counts V and VI)

In Counts V and VI, PBM alleges that Bookworld fraudulently induced it to enter into the Agreement, based on Smith's misrepresentations. To the extent PBM alleges fraud in the performance of the contract, based on Bookworld's failure to pay and return inventory (Dkt. 62, ¶¶ 85-92), this claim is barred by the economic loss rule. *Banker's Mut. Capital Corp. v. U.S. Fid. and Guar. Co.*, 784 So. 2d 485, 489 (Fla. 4th DCA 2001); *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1316 (11th Cir. 2007). Bookworld's motion for summary judgment on Count V is therefore granted. However, the economic loss rule does not bar fraud claims based on acts *independent* of a breach of contract. *HTP v. Lineas Aereas Costarricenses*, 685 So. 2d 1238, 1239 (Fla. 1996) (emphasis added). PBM alleges that Smith represented that Bookworld would market and sell PBM inventory to PBM's own 1000 accounts and to an additional 1000 religious and 2000 non-religious accounts. (Arruda Aff. ¶ 5). This provision is not included in the Agreement, and it is therefore

20

independent of the breach of contract action.[15]

In order to prevail on a claim for fraud in the inducement, PBM must show that (1) Bookworld made a misrepresentation of a material fact; (2) Bookworld knew or should have known of the falsity of the statement; (3) Bookworld intended that the representation would induce PBM to rely and act on it; and (4) PBM suffered injury in justifiable reliance on the representation. *Joseph v. Liberty Nat. Bank*, 873 So. 2d 384, 388 (Fla. 5th DCA 2004). Smith is individually liable for fraudulent inducement, to the extent that he personally made misrepresentations. *Checkers Drive-In Restaurants, Inc. v. Tampa Checkmate Food Servs., Inc.*, 805 So. 2d 941, 944 (Fla. 2d DCA 2001).

PBM cites no evidence indicating that Bookworld did not actually possess the 3000 accounts that Smith represented.[16] Accordingly, the issue is whether Smith misrepresented that Bookworld would contact those accounts once the Agreement was in effect. "An action for fraud generally may not be predicated on statements of opinion or promises of future action, but rather must be based on a statement concerning a past or existing fact." *Mejia v. Jurich*, 781 So. 2d 1175, 1177-78 (Fla. 3d DCA 2001). There is an exception when "the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that said person knew or should have known from facts in his or her possession that the statement was false." *Id*. PBM has cited no record evidence indicating that Bookworld or Smith intended at the time he made the promise not

---

[15] After the Agreement was executed, PBM alleges that Smith made misprensentations concerning its projected sales of PBM inventory, the number of its sales staff, and the number of its sales staff devoted to the PBM account. Because the evidence supporting these representations is contained in Exhibit H, which the Court has stricken as inadmissible, these allegations are not evaluated.

PBM has also claimed, in passing (Dkt. 57 at 19-20), that Bookworld induced it to not file suit by promising to pay. PBM has cited no legal authority for this argument and includes no citation to record evidence. Accordingly, this argument is also not evaluated.

[16] PBM argues that Smith equivocated by testifying that Bookworld had "approximately" 3000 accounts. (Smith Dep. at 70). This testimony is not sufficient to constitute a misrepresentation.

to perform. *Thompkins*, 476 F.3d at 1316. PBM argues, however, that Bookworld and Smith should have known that they could not contact all of the accounts, given the size of Bookworld's sales staff. Although this is a close question, the Court finds that the cited evidence is sufficient, albeit barely, to create an issue of material fact as to whether Bookworld and Smith knew or should have known the representation was false. *See D & M Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485, 487 (Fla. 4th DCA 2003) ("As a general rule, it is a matter for the jury to determine if an intentional misrepresentation has been made").

The parties' motions for summary judgment are therefore denied on PBM's claim for fraudulent inducement (Count VI). Bookworld's and Smith's motion for summary judgment is granted on PBM's claim for fraud (Count V), and PBM's motion is denied.

### E. Unjust Enrichment (Count VIII)

In its final counterclaim, PBM alleges that Bookworld and Smith have been unjustly enriched by the retention of the collections not paid under the Agreement and PBM's inventory. As discussed above, PBM has a viable breach of contract claim against Bookworld, and the existence of an adequate remedy at law defeats a claim for unjust enrichment. *Shibata,* 133 F. Supp. 2d at 1316.[17] Accordingly, Bookworld's motion for summary judgment is therefore granted on PBM's claim for unjust enrichment against Bookworld, and PBM's motion on this count against Bookworld is denied.

In order to prevail on a claim for unjust enrichment against Smith, PBM must demonstrate: (1) a benefit conferred upon Smith by the PBM, (2) Smith's appreciation of the benefit, and (3) Smith's acceptance and retention of the benefit under circumstances that make it inequitable for him

---

[17] To the extent PBM has a viable statutory remedy pursuant to FUDTPA against Smith, individually, the unjust enrichment claim is also barred. *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp.2d 1170, 1178 (M.D. Fla. 2005).

to retain it without paying the value thereof. *Rollins, Inc.,* 951 So. 2d at 876. As previously discussed, PBM has provided no evidence that Smith, individually, appreciated or retained PBM's collections or inventory. Bookworld's motion for summary judgment is therefore granted on PBM's claim for unjust enrichment against Smith, and PBM's motion on this count against Smith is denied.

### *Conclusion*

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1)      Defendant/Counterclaim Plaintiff PBM's Motion for Summary Judgment (Dkt. 57) is **GRANTED IN PART** as to PBM's counterclaim for breach of contract against Bookworld (Count I), as more specifically set forth in this Order, and PBM's claim for conversion of inventory against Bookworld (Count III), as more specifically set forth in this Order; **DENIED IN PART** as to the remainder of PBM's counterclaims; and **DENIED AS MOOT** as to Bookworld's claims.

2)      The Motion for Partial Summary Judgment by Bookworld and Smith (Dkt. 58) is **GRANTED IN PART** as to PBM's counterclaims for: breach of contract against Smith individually (Count II), conversion (Count III) against Smith only, fraud (Count V) against Bookworld and Smith, civil theft (Count VII) against Bookworld and Smith, and unjust enrichment (Count VIII) against Bookworld and Smith; and **DENIED IN PART** as to the remainder of PBM's counterclaims.

3)      Bookworld and Smith's Objection and Motion to Strike Certain PBM Exhibits (Dkt. 65) is **DENIED IN PART** as set forth herein and **GRANTED IN PART** as to Exhibit H (Dkt. 57-18). Exhibit H (Dkt. 57-18) is hereby stricken.

**DONE AND ORDERED** in chambers this 16 day of November, 2007.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

23